UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CR-128 |
| | ) | (Jordan / Guyton) |
| MARLO DEAN ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. On January 30, 2008, this matter came before the Court for an evidentiary hearing on the defendant's Motion to Suppress Evidence [Doc. 14] arising from a traffic stop. Defendant Marlo Anderson ("Anderson") was present with his counsel, Kim Tollison. The government was represented by Assistant United States Attorney David Lewen. The Court received the testimony of two witnesses, two exhibits and heard argument of counsel on the merits of the motion. On January 31, 2008, the Court took this matter under advisement. After a careful review of the record of the hearing and consideration of authority, this Court finds the traffic stop was valid and recommends the motion be denied.

### I. FACTS

The parties are in agreement as to the facts of the traffic stop that lead to Marlo Anderson's arrest; their dispute lies in the application of the law to those facts. Sometime after 11 o'clock on

1

the night of August 10, 2007, Marlo Anderson was driving a light colored Chevrolet Caprice sedan along Houston Avenue in Oak Ridge. Anderson was stopped by Lieutenant Michael Uher of the Oak Ridge Police Department. When police searched the car, crack cocaine and a firearm were found, precipitating Anderson's pending criminal charges. In support of the traffic stop, the United States presented testimony as follows:

*1. Michael Uher*

<u>Direct Examination</u>

Lieutenant Michael Uher testified that he has been with the Oak Ridge Police Department since 1991.[1] On the night of August 10, 2007, Uher was supervising what he described as a "saturation patrol" when he saw the Caprice. Uher testified that he could not "see a license plate securely fastened to the rear of the defendant's car." Because he could not see a license tag, Uher activated blue lights and stopped the car. Uher approached the driver and informed him that he had been stopped because the officer didn't see a tag on his vehicle. Uher testified that when he asked the driver for his license, he recognized the driver "right away as Marlo Anderson." The United States introduced Exhibit 1, a DVD recording of the stop of Anderson's car made by an in-cruiser camera.

Uher then contacted a K-9 unit to conduct a drug-detection sniff on the Caprice. The handler, Officer Brooks, reported a positive alert on the car. Anderson was then asked by the officers to step from the car. Officer Holbert conducted a pat-down on Anderson, felt something in one of the subject's pockets and asked if he could remove it. Anderson responded in the

---

[1] Uher testified on direct and cross examination for some 45 minutes and the Court will not undertake to recap every aspect of that testimony. The description offered herein is instead intended to draw a factual context for the Court's recommendation.

affirmative and Holbert retrieved what Uher described as "a pretty good quantity of crack cocaine." During this pat-down, Uher and Brooks were searching the inside of the Caprice. Brooks found a 9 mm handgun in the floorboard.

Uher testified that he initially reported to the United States Attorney's office that there was no videotape recording of the stop of Anderson's car, although later it was determined that a videotape had been made by the car Uher was patrolling in. Uher explained that since he was promoted to Lieutenant in 1998, he has been assigned an unmarked car for his police use. During the special assignment "saturation patrol" Uher was in a marked patrol car equipped with an in-cruiser camera. Uher testified that when he was prompted by a related conversation with another officer, he checked with the police department and learned a videotape had been made. Uher stated that he notified the prosecutor and obtained a copy of the recording.

Cross Examination

On cross examination, Uher testified that the special operation being conducted on the night of August 10, 2007, involved two-man marked patrol units stopping cars for traffic violations. Uher was in a cruiser with another officer, Bill Weaver. Uher described this operation as "proactive policing." Uher testified that the patrol division had reported problems making traffic stops: vehicles were fleeing from the attempt to stop and, because the department has a "no pursuit" policy, often making good their escape. The saturation involved multiple cruisers affecting a traffic stop, with one unit pulling in front of the subject vehicle, to block any flight.

Uher testified that while he recognized Marlo Anderson when he approached the vehicle, Uher had never seen Anderson drive this car and had not recognized him before the stop. Uher had

spoken to Anderson on two prior occasions, once as a witness and another time as a suspect. Uher's testimony described a negative impression of Anderson.

Uher maintained that while the license plate is now clearly visible to him in the back window of the car on the videotape, he did not see the plate at the time of the stop. Uher testified as follows: that he looked "where normally a license plate would be affixed to the vehicle where the light was....on the bumper." When asked whether he became aware of the license plate in the driver's side of the rear window as he walked past it to approach the driver, Uher testified that he did not, although he "actually walked right past it."

Uher was confronted on cross examination with prior testimony given in a state court preliminary hearing that, "I stopped it right as the road changes into Dillard. I noticed it had a license plate up in the back window." Uher explained that, at some point during the stop, arrest and search he did realize there was a license plate in the back window but did not see the plate before he stopped the car. Uher testified that he was focused on the driver and passenger inside the car, rather than looking for a license plate, though this focus caused him to look at these persons through the windows of the car including the rear window.

Uher testified that the license plate was not "swinging" and that it was more than 12 inches from the ground. Uher stated that the plate was otherwise a valid tag, registered to the correct car and not expired. After looking at a photograph stipulated to be the car in question, in substantially the same conditions it was at the time of the events, photographed during daylight, Uher testified that he could not identify the feature in the back window as a license plate. Uher testified that the reflection from the surface of the plate may have made it look like a mirror or a video screen on the back of a headrest or some other object.

4

Uher testified that he originally recalled the license plate had been laying down on the rear shelf board just under the rear window. Uher testified that he believed this to be a fact and it is what he told the prosecutor for this case until the videotape was discovered. Uher further testified that another officer saw the plate and confirmed it was valid before the canine arrived at the scene.

*2. Brad Jenkins*

<u>Direct Examination</u>

The United States next called Brad Jenkins, also of the Oak Ridge Police Department. Jenkins testified that he has been with that police force for almost 20 years and is currently assigned to the narcotics unit in the rank of sergeant. Jenkins testified that on the night of August 10, 2007, "myself and other members of the narcotics unit were assisting in a patrol saturation where we just go out and patrol and look for violations and assist patrol officers in that activity."

Jenkins testified that it was he who called in the license plate number for a records check after Anderson's car was stopped. Jenkins testified that he shone a flashlight through the rear window so he could see it properly and read the information over the radio. When asked where the license tag was placed, Jenkins testified, "I found it to be in the back window." Jenkins testified that the placement of the plate made it sit "at a slight angle." Jenkins testified that the plate had a reflective coating, like other Tennessee license plates.

Jenkins testified that he measured the Caprice and that the car is 211 inches long. He also measured from the location of the license plate in the rear window to the rearmost edge of the car, which was 48 inches.

Cross Examination

Jenkins testified that the defendant's tag was valid, but that he was not the officer who made the stop. He also testified that when he walked up to the defendant's stopped car, he saw the plate in the rear window. Jenkins conceded that temporary tags are sometimes taped in the rear window, but maintained that this is a violation of state law.

## II. GOVERNMENT'S POSITION

The United States argues that Anderson's license plate being placed in the rear window of the vehicle was in violation of Tennessee Code Annotated § 55-4-110 Attachment of Plates, which reads, in relevant part:

> (a) The registration plate issued for passenger motor vehicles shall be attached on the rear of the vehicle.
>
> ***.
>
> (b) Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12") from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible. No tinted materials may be placed over a license plate even if the information upon such license plate is not concealed.
>
> Tenn. Code Ann. § 55-4-110.

The government argues that the statute requires four things of a license plate, and that Anderson's display did not comply with any of the four. First, the government argued that the language "on the rear of the vehicle" does not include plate display inside the rear window of the passenger

6

compartment.  Second, the requirement that the plate "shall at all times be securely fastened in a horizontal position" was not satisfied by this license plate wedged into the trim of the interior, not otherwise fastened.  Third, the United States argues that the plate was not "clearly visible" as required by the statute.  The government argues that the photograph introduced by the defense as Exhibit 2 is not relevant because it was taken during the daytime from a standing vantage point (rather than seated in a patrol car) and the viewer was stationary.  On this point, the government argues that Uher, in fact, did not see the license plate, attesting to its improper display.  Lastly, the government argues that Anderson was not in compliance with the provision that "[n]o tinted materials may be placed over a license plate" because his plate was inside a window that had a manufacturer's tint on the glass.  The government did agree, however, that there was no reason for anyone to believe the window had a tint on August 10, 2007, and the fact required further investigation within the weeks before the evidentiary hearing.

The United States asserts that the placement of the license plate in the rear window is akin to placing it on the back of the driver's headrest or taped to the rearview mirror.

### III. DEFENDANT'S POSITION

It is the defendant's position that his license plate was lawfully displayed inside the rear window of his car and, therefore, there was no legal cause to stop his vehicle.  The statute in question requires the plate to be displayed "*on the rear* of the vehicle."  Anderson argues that the rear window of the sedan was, in fact, on the rear of the vehicle in that the placement was behind the rear seat, over the rear wheels and clearly visible to a person behind the car.

7

Anderson's argument recognizes that if Uher had probable cause to believe a traffic violation was committed, he was justified in stopping the Caprice, because "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993) (en banc); see also Whren v. United States, 517 U.S. 806, 819 (1996). However, Anderson argues that the fact that Uher did not see a license plate on the bumper does not transform the facts to constitute a traffic violation. Anderson emphasizes that the statute does not say the license plate is to be displayed "on the bumper," and the officer's mistake cannot constitute probable cause.

## IV. ANALYSIS

As the facts are largely undisputed, the Court must apply its factual findings to the traffic law at issue. While there may be exceptions, modern cars are typically designed with a rectangle feature for display of a license plate. This feature is generally cosmetically integrated into the build of the car itself and located in the center of what is best described as the rear bumper. The question in this case is whether the Tennessee legislature has required, as a matter of law, for the license plate to be affixed to the place so provided by auto manufacturers or whether any rear-facing display of the plate complies with the statute.[2]

The Court is cognizant that penal statutes should be construed strictly against the government and ambiguities should be resolved in favor of the accused. At the same time, however, statutes

---

[2] The Court finds that given the posture of this case, it is not a dispositive fact whether Uher *actually* saw the license plate in the rear window or whether any police officer with reasonably passable eyesight would have seen the plate. Had Uher seen the plate and it were improperly displayed, he would be observing the same violation of the registration law as if he had seen no plate. Had Uher *not* seen the license plate and the plate were legally displayed, no violation of the law would have occurred.

8

should not be narrowed so much as to exclude cases they would fairly cover. The parties agreed that there is no case directly on point, and the Court has found none. At least two other courts have, however, interpreted the requirements of. § 55-4-110 with similar supporting arguments, and the opinions issued do provide some guidance.

In <u>United States v. Dycus</u>, 151 Fed.Appx. 457 (6th Cir. 2005), the Sixth Circuit has characterized the physical auto feature generally provided for the mounting of a license plate in the middle of the rear bumper as "the place where the plate is to be displayed." In <u>Dycus</u>, police "were on patrol [at night] when they observed a vehicle driving in the opposite direction .. [and were] unable to determine if the oncoming vehicle had a license plate because there was no illumination in the place where the plate is to be displayed." <u>Dycus</u>, 151 Fed.Appx at 459. The officers followed the car and were finally able to read the plate after activating blue lights, but before the car actually came to a stop. While Tennessee law did not specifically require the plate to be illuminated, the same statute at issue in Anderson's stop did require that: "[e]very registration plate shall at all times be ... in a place and position to be clearly visible." Tenn.Code Ann. § 55-4-110(b) (2003). Finding that the driver had not made her plate "clearly visible" because the officers could not tell whether the car had a plate or not until they got within 15 to 20 yards, the Sixth Circuit concluded the police had an objective basis to believe the statute was being violated when they made the stop.

The <u>Dycus</u> court placed significant emphasis on an unreported Tennessee Court of Criminal Appeals treatment of this code section in <u>State v. Matthews</u>, No. M2001-00754-CCA-R3-CD (Tenn.Crim.App. 2002). In <u>Matthews</u>, at approximately 7:00 p.m. in mid-September, a police officer observed a motor vehicle without a light illuminating the license plate and could not determine if the vehicle had a license plate. <u>Matthews</u> at *2. After following the car and initiating

9

a traffic stop, the officer saw the plate was displayed, but not illuminated. Tennessee law did not require Matthews to have his headlights turned on at that time of day, which would have also turned on the light to illuminate the plate. Nonetheless, the court found that the license display statute *did* independently require the driver to make his plate visible.[3]

In United States v. Sanford, 476 F.3d 391 (6th Cir. 2007) the defendant challenged his traffic stop for violation of the Tennessee following too closely law as unreasonable. The Sixth Circuit restated the appropriate limitations of this Court's assessment of an alleged violation of state traffic law: "the relevant inquiry is whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation in fact occurred." Sanford, 476 F.3d at 396. Tennessee courts have, evidently, not clearly decided the issue of whether it is lawful in Tennessee to display a license plate in the rear window, although the testimony established that this does occur, especially as to temporary, paper tags. This Court, therefore, is left with the inquiry mandated by Sanford: did Uher possess probable cause or reasonable suspicion to believe that a traffic violation occurred.

This Court concludes that while Anderson's license plate was rear-facing, it was not *on the rear* of the car, as required by Tenn. Code Ann. § 55-4-110(a). The Court finds the facts and circumstances within the knowledge of the officer "were sufficient in themselves to warrant a man of reasonable caution in the belief that" the rear window display of the license plate, even if visible

---

[3] The Tennessee court emphasized the personal responsibility placed on the driver by observing as follows: "[a]s stipulated by the parties, in an American automobile the license plate light is activated by turning on the headlights. This unfortunate design feature in the appellant's vehicle does not excuse his failure to keep his license plate illuminated so as to keep it clearly visible." Matthews, at *3.

to the following officer, violated the statute. Sanford, 476 F.3d at 395 (6th Cir. 2007) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)).

## V. CONCLUSION

The Court finds that Uher had probable cause to believe the Tennessee license plate law was being violated by the defendant when he stopped the defendant's vehicle. Anderson has raised no other challenge to the events leading to his arrest and has withdrawn his challenge to the use of a drug detecting dog. After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence **[Doc. 14]** be **DENIED**.[4]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).